The next case on the calendar is Anderson v. News v. American Media. I've been confused about the scope and nature of the conspiracy that you're alleging and when it was formed and how it was joined. Because it seems to me that there were several possible objectives to what you're alleging. One is to all agree together not to accept the surcharge, perhaps not to accept the restructuring that was proposed on the inventory costs, also not to provide, whether to ship or not, some of the defendants shipped, some did not, whether to negotiate at all with respect to the proposal or demand perhaps, and also with respect to reducing the number of wholesalers who were servicing the publishers and distributors. Could you address what you say when the conspiracy began, what its objects were, whether it changed over time? Absolutely. That's what I was going to do as I was going through the emails. It will reveal precisely that. The objective of the conspiracy was twofold, to reject Anderson's surcharge, make sure everybody was on board for that so that some didn't go ahead and ship to Anderson and pay the surcharge and get an advantage in terms of retail shelf space. You just said ship as well. So there are two things one could have done. One could have rejected but decided to take the chance of going ahead and shipping the February magazines, right? The objectives were twofold. One, to reject the surcharge and make sure everybody else rejected the surcharge because they were concerned, as they said in the email, if anybody starts paying this, the other wholesalers will ask for it as well. The second objective was to drive Anderson and Source out of business and make it a two-wholesaler system. What do you point to? I know there's some deposition testimony, I think, with respect to the two-wholesaler system. But like Judge Chin, I'm not sure really why that makes economic sense to them. And also that came relatively late and only pertained, I think, to Curtis and TWR. Are you saying that the objective was to drive Anderson out of business was agreed to early on in the conspiracy and involved all the defendants? It was agreed to early on. As I said, on that email in the morning of January 13th, they said, Bauer is on board, Bauer is 100% with us. Is there anything to suggest that Bauer is on board to driving Anderson out of business? Yes. In fact, I'll quote. Bauer responded to this email saying that, quote, in lieu of giving more discounts, that is, instead of meeting Anderson's terms, quote, our best strategy now is to get Bauer and as many other big players as possible on board, moving business away from Anderson. And Pecker, who's- This is Roscoe's email, and am I correct about that? Yes. This is one, actually, it's on CA-1778 of the Joint Appendix, and it's one email chain. The first email was from Mike Porche of DSI. Excuse me, doesn't that email say that they're on board with at least attempting to reduce costs for wholesalers? It does. We should start using our resources. But it says, in lieu of giving more discounts, in other words, in lieu of meeting Anderson's terms, our best strategy now is to get Bauer and as many other players on board as possible, moving business away from Anderson. Now, the very next day, Rich Parker of Bauer met in person with Pecker of AMI. Again, these are direct competitors. And later that day, Parker reported, quote, Pecker is with us. And in the same email, he says, time is as well, and, quote, as a matter of fact, no one will agree with Anderson's surcharge proposal. So by January 15, the date of that email, conspiracy was fully in place, and all they had to do was stick to the terms of it by all collectively refusing to agree to Anderson's proposal. There are other evidence, and I'm helping, I'm glad you're here to help us understand the record. But there seems to me substantial evidence that there may be, you could read that email that way perhaps, but then there's substantial evidence that the defendants did different things. So time is in negotiation. It makes an offer of 2%. According to your client, it reaches an agreement on the 31st that it then reneges on. That doesn't seem consistent with the we are all going to stand firm throughout this conspiracy. This email evidence, I'm just telling you what I'd like you to address, is evidence from Castardi that Curtis is attempting to negotiate, and they can't get in to negotiate with your client. Again, it doesn't seem like that portion of the email record is consistent with the inferences that you're trying to draw from these specific emails looked at in isolation. Let me try to address those in turn. With respect to the different reactions originally to the proposal, the court addressed that very issue the first time around on the motion to dismiss, and it said the mere fact that people had different reactions at the start, or some negotiated and some didn't, is no indication that they didn't conspire because they could have conspired after they initially responded, and also they could have been hedging their bets. And what the emails show is in fact they were hedging their bets because they were afraid that there would be defections. And there's a whole flurry of emails starting around January 27 in which that very subject comes up, in which they express concerns that Anderson will, quote, piece us apart, that any defections could, quote, blow up the entire plan. Mr. Allager of Rodale, another one of the publishers, writes to Porsche at DSI in a kind of panicked email and says, that Comag had reached an agreement with Anderson to continue shipping products and to negotiate a new agreement with Anderson. He writes, Comag will ship! All caps, exclamation point. Comag is dangerous. Then Weissong at DSI writes back to him and says, Calm down. Everyone just needs to stick to their guns. Mr. Allager then sends an email. Is our man in Bauerland still solid? Now, Bauer is his direct competitor. He's saying, is he going to stick to the plan? Can I actually address just a side question from you for a moment? You refer to them as direct competitors, but unlike the providers of a commodity like paper, for example, we have a huge array of magazines here that are created and circulated by these publishers, from People to Car and Driver to Bicycling to Twist and magazine prices that wildly vary, different kinds of business models. I'm not sure I can see them quite as the direct competitors for whom these kinds of conversations are quite so nefarious, as you like to suggest. There are all sorts of books, too, and yet the book publishing market is a properly constituted market, the magazine market. For single copy magazines, the evidence is quite clear, and defendants have not disputed that that is a relevant market. And what they're competing for... It's a little bit different, though, in the Apple case. Well, but it is essentially price-fixing here, as I'll explain. But they're competing for shelf space in retailers. They're competing for exposure on the shelves at retailers, and there's only a certain amount of magazines that people read and that they're going to buy. If that's so, why is it in their economic interest to reduce the number of wholesalers available to two? Dr. Marks explained that in her report with some care. She's a distinguished antitrust economist, and she explained that in a two-sided market like this, the way it was working is Anderson was hired by retailers, Source was hired by retailers, and their interest was reducing publishers' costs for the benefit of their retailer clients. She said in a two-sided market, if you reduce it so that you only have two wholesalers and they have a geographic distribution, retailers have no choice whatsoever. They have to accept price changes being thrust down on them. And that is, in fact, exactly what happened after Source and Anderson exited the market. And that takes some... The theory is that takes pressure off the publishers because the wholesalers are able to obtain more money from the retailers. Exactly. Anderson News was a disruptive force because they wanted to change... What about the counterargument that the retailers in this industry may decide just not to have as much space devoted to magazines and put other stuff on the shelves? Well, that is exactly what happened. I mean, because the publishers did, through their two-wholesaler system, push price increases down on retailers. And so it's questioned... When I studied economics, the professor would always say it depends on the shape of the curves. And if the publishers are going to get more per magazine but maybe sell less magazines because retailers won't devote as much space, if they're getting a monopoly profit, then they're going to benefit from that. You still are saying, though, that this conspiracy then to put Anderson out of business didn't occur until after Anderson made its proposal or demand that publishers accept the new pricing and the restructuring and that all that happened between January 12th and I think first January 23rd. But in any event, by the time it came to ship for the February publication, right? That's correct. And the emails reflect a certain amount of anger and frustration and annoyance with Anderson because Anderson, as the head of Time put it, was an irritant. And the fellow from Time Warner Retailers says, we're going to teach these guys a lesson. We're going to make this a two-wholesaler system. I mean, one of the most damning things is the testimony of Mr. Gillis of Source. He had a conversation with both Mr. Jacobson of Time Warner and then with Bob Castardi of Curtis. And Curtis is very important because they represent three different publishers. They represent AMI, Rodale, and Hachette. And so getting the two of them together on the same page was absolutely critical. And what Mr. Gillis says in his testimony, it was Mr. Jacobson first who told me he was going to make it a two-magazine wholesaler system and I was not going to be one of them. When does he say this conversation occurred? This conversation occurred, I'm not positive, around January 31st, I believe. Because that's part of what was striking me, that the first mentions we see of the two-holder system seemed to be the very end of the period in which the ultimatum expired. There are other emails that I can go through and other references if I could get to that. But I did want to finish this because, frankly, this one page of deposition testimony is enough right there to support a jury inference that the defendants were conspiring to reject the surcharge. Why doesn't it just apply, though, to Curtis and to Time Warner distribution? What about them? Gillis' testimony that Jacobson of Time Warner told him that he had custody of Curtis, so that those two, that they were going to make it a two-wholesaler system. I saw much less about the other defendants, Hachette, Rodale, Bauer, AMI, ever talking about a two-wholesaler system. Did I miss...? Well, I can walk through that with you. It's laid out in our reply brief, pages 36 to 47. You're saying they all were part of the... to reject the surcharge and drive Anderson out of business by refusing to ship magazines. So this is actually a very critical conversation. So Mr. Jacobson said, I'm going to make this a two-wholesaler system. And Gillis responds, impossible. You can't do it unless you have everybody else. He says, quote, all I need is Bob Castardi, Bob Castardi being the head of Curtis, which represents three of the other publishers. All I need is Bob Castardi, and I got Bob Castardi. I said, no, you don't have Bob Castardi. And he said, I've already met with him. Yes, I do have Bob Castardi. I hung up the phone, and I called Bob Castardi. Bob Castardi said, quote, if Rick says right, I go right. If he says left, I go left. We're in lockstep. We're doing this together. This is going to be a two-wholesaler system, and you aren't going to be one of them. Question. And those were Mr. Castardi's exact words. Answer, yes. So both sides, the time side and the side represented by Curtis, AMI, Rodale, and Eschette, are coming together to agree to put Anderson out of business. Sue, can you address whether the results would have been different for Anderson if independently, as one could presume, each had, as the district court found, each of the publishers and distributors had rejected the demand that for the February shipping, everyone accept the price hike and the changing inventory costs and so on. So they reject that. They don't ship. Anderson has this going dark policy or plan, and they are left without magazines. What would have been different? Wouldn't they have had to shutter anyhow? That was kind of the plan. Anderson never sought judicial intervention to require the publishers to accept the price. Anderson thought that because it had two of the largest retailers in the country, Kroger, Walmart, and various others as its exclusive clients, that it had something of great value to offer the publishers and that the publishers would come to the table and negotiate. He wasn't necessarily expecting to get all seven cents. In fact, he negotiated a deal with Comac that was going to give him a 2% discount. He thought he had negotiated a deal with Time Warner that was going to give him He needed a going dark plan, and why did he need to declare it all over right after the injunction was entered? Because that was ultimately the leverage that he thought he had to bring them to the table. And there's certainly nothing inherently wrong with that. If they won't meet his pricing terms, he doesn't have to deliver their magazines. And that was his only leverage in the end. I'm not saying that the publishers could not have each said, you know what, this is too much, we can't afford to pay this, and said that to Anderson. But they can't get together and agree jointly to do that. Is there any case that there's no obligation on the publishers, is there, to accept a super competitive pricing offer? There were other wholesalers who were offering better terms. Your Honor, calling it a super competitive price ignores the conspiracy itself. Because Anderson made a price proposal that it thought was reasonable. Whenever anybody raises their price because they think it's a valuable price, prices are set by market conditions, which is by bargaining between individual sellers and individual buyers. And what Dr. Marks indicated, that if the defendants had not conspired and joined together, she felt that they would have reached some sort of accommodation with Anderson, like the 2% proposal. Based on what? Based on her study of the industry and based on what Comac did, based on the proposal that Time Magazine did, based on her analysis of the finances of the publishing and the wholesale industry. Anderson's behavior during this very compressed time period seemed inconsistent with offering to negotiate. It presented its price hike as a demand. It said, this was on January 12th, 13th, and 14th, with respect to the February shipment, said sign this or take your chances, we're not shipping. It said that it gave a very compressed time in which its long-term customers needed to make a decision. That seems inconsistent with a, we have a real long-term problem here. This is what I'm proposing here at the inventory cost. The whole industry has to be restructured. This court addressed exactly that issue in the prior opinion. And what it said was, even if it was non-negotiable, that's not an excuse for a conspiracy. And in any event, the allegations, the complaint were that it was negotiable, and Mr. Anderson in his deposition testified it was negotiable, and he actually negotiated it. Here we are with a record now. Oh, exactly. Exactly, but the court was commenting on the analytical constructs that the district court mistook, in which he essentially had false ideas about how the antitrust laws apply here. And one of them was that if you say I'm not going to negotiate, then they can somehow join together and conspire. And that's certainly not the law. It's never been the law. Indeed, I believe in the publications paper case, the court made that point as well. And certainly in the Apple case, the court made the point that just because people think, you know, this is going to lower prices generally, doesn't mean they can get together and conspire and disrupt market forces. To address, as your clock is ticking down, the issue of antitrust injury, Anderson had been losing money, lots of money, for 13 years, and it makes this demand, which isn't accepted. I mean, what is the evidence of antitrust injury here? Your Honor, this court made it clear in cases like Lombard and Auto West that simply because there's a history of losses does not mean that a going concern has no market value. Indeed, there's a very careful report that's in the record from Dr. Leese indicating various ways in which, according to his analysis, Anderson News was still a valuable company. And indeed, Anderson News made money in the last quarter of 2000. Well, it's actually the first quarter of fiscal year 2009, which began in October 1 of 2008. It actually made money there. But it turned the corner because through a series of acquisitions, which got bigger, it had a lot of debt and was working through that, and it's one reason that it was not making money before, but they'd implemented various reforms in how they were doing business, and they were beginning to turn a profit by the end of 2008. So how the district court judge can say, well, I'm sorry, you know, it was worthless. There was no antitrust causation here because Anderson was going out of business in any event. That is not a legitimate form of argument when the plaintiffs purposely put Anderson News out of business. Could you also address the claim in your adversary's briefs, I think Cable makes it, Curtis, that they were owed substantial amounts of money by Anderson and so they had no economic interest in seeing it go out of business? Again, it sort of depends, short-term versus long-term. And we have e-mails in the record in which both Time and Rodeale says, notwithstanding that, eliminating Anderson as source is, quote, good in the long term. And we have an e-mail from Time Magazine that says So the judge can't decide this. They can make that argument to the jury. They can make all these arguments to the jury. But the judge doesn't get to decide what the only possible inference is from these facts. We put in plenty of evidence to show that Anderson was going concerned, it was put out of business by the defendants and by a conspiracy among the defendants, and that has to be decided by a jury. Thank you. Good morning, and may it please the Court, Rowan Wilson from Travatt Swing, and we're for Time, Inc. and Time Warner Retail Sales and Marketing, Inc. Could you speak up a little bit? Let me move this a little bit closer to me and up, perhaps. I'm also going to argue on behalf of Trichette. It's Deputy General Counsel Jonathan Donnellan is here as well and he's going to keep me on the straight and narrow in case I go astray. So being here after a full record and being here on a motion to dismiss are very different, but probably not for the reasons you think I'm going to say. They're very different because the federal rules do not require a plaintiff to plead adverse facts, facts that would destroy its complaint. And I want to focus here on entirely undisputed facts shown in discovery, either straight from Mr. Anderson's mouth in depositions, and he is the person who controlled both of the plaintiffs here, or from responses to our statement of undisputed facts that were undisputed, not disputed by the plaintiffs here. And I put those really into five buckets. The first has to do with the nature of the competition between the news group and Anderson News. Mr. Anderson submitted a declaration on summary judgment that says the following. Anderson's distribution footprint overlapped significantly with TNG because of Anderson's and TNG's joint venture, Prologix, which used the same facilities, same trucks, and same employees to distribute magazines to retailers in various regions of the country. It's also an undisputed fact that over 80% of the retail value of magazines distributed by Anderson News to retailers were distributed in zip codes that were also served by the news group. There's a joint venture, Prologix, between the two of them. It's also, you can see on the face of the agreements which are in the record, that the parties owed each other a fiduciary responsibility. Mr. Anderson affirmed that in his deposition. The agreements also say on their face that the creation and operation of the joint venture will not diminish competition between the news group and Anderson News, and that each of Anderson News and the news group can tell Prologix what services Prologix must provide to each of those independently of each other. That's all in the record. That's a matter of law. If you want to look at the agreements, you can read them for yourself. They're quite clear. The second bucket of facts has to do with Time's behavior. So Time, even before January 12th, and this is, again, undisputed, made an offer of two points off of the cover price for its weekly magazines. Mr. Anderson, in his press conference, whatever we'll call it, his phone conversation with the entire industry, his interview, admitted that and expressly said, but that's not enough. I want more than that. That is the same two points that works its way through the whole month of January. It's also stipulated that two points is the economic equivalent of 2.75 points just on people. Mr. Anderson was repeating. There's evidence that Time reached an agreement with Anderson and then Time just walked away from it, which Anderson argues supports the notion that in the end it went along with the boycott. What it actually supports is the firm conclusion that Anderson News was never going to accept the two points or the 2.75 points, that amount of money that Time Inc. had offered continuously, because the agreement is not for one or the other of those. It's for both of those. It's a higher cost. And the important fact here is two things. I thought Anderson agreed to the two points. No. Anderson claims it got a better deal. It got two points on all the weeklies except people and got 2.75 points on people. So it got sort of a double payment. The point is there was an agreement, and then to its surprise, Time walked away from the agreement. At least that's the assertion. Right. So that's disputed, but as I said, I'm not trucking in disputed facts. But what is important is on the 27th, Mr. Anderson and Anderson News were offered, just for 30 days if they wanted that, with no other strings attached other than just pay your January bill on time, the two points of discount for a 30-day negotiating period, and he immediately, Mr. Anderson immediately declined it. The next day, Time signed with the news group a 10-year distribution agreement at that 2.75 points on people only. Right. And that's why the first and second set of undisputed points marry here. Time has a distributor now who for 10 years has guaranteed the 2.75 points on people alone. That uses the same trucks, the same people. These trucks roll, and they have pallets, totes they're called, that are going to one store and the next. And the first store may be a news group store, and the second group may be an Anderson store, and so on. It's the same driver, the same merchandiser. It's a joint venture. So now they know they have this price, and they have this deal. They don't need anything else. And although what Mr. Anderson says happened is not at all what happened, and the story is pretty ugly about what really happened, and I'm not going to get into it, what does it matter if his boss, Ann Moore, sees this and says, wait a minute, don't we already have a deal with somebody else who can replace these guys using the same facilities? All it proves is that Mr. Anderson did not, and, you know, Mr. Kellogg says, prices are supposed to be determined by market conditions. Well, that's the market condition. His competitor says, I'll do it for this price. That then takes us to the going dark plan. Why do you have a going dark plan? Well, Mr. Anderson testified that he developed the going dark plan in 2007 and 2008, long before any of this, and he didn't develop it in anticipation of a boycott. His testimony is he developed it in case he couldn't get a deal. Why do you think maybe he couldn't get a deal? Because he had tried over and over to have a $0.07 surcharge, an $0.08 surcharge in metropolitan areas, a pushback of the scan-based trading inventory, which, by the way, means a $70 million unsecured loan to a company that has been losing money, $120 million from 2004 to 2008. Is that an attractive proposition to loan somebody money to? So that's what he announced. He had failed each time, and his testimony is he went to time, he said, I'm going to charge the surcharge in 2003 and 2005 and 2007, I'm going to push back the scan-based trading inventory. Time said no, and his testimony is those were credible threats, and if time had done that, it would have injured his business. He doesn't say in his deposition they couldn't have ever done that. He says that would have been a credible threat. I would have been hurt. Let me talk about Hachette for a moment. Hachette, as the court has sort of noted, did something completely different. They said, we've got monthly magazines, we've got 780,000 copies of them, and that's in the record in the Curtis book. There's two sets of e-mails, one from before February 1st and one from February 3rd, in which they confirm, title by title, the 780,000 copies of Hachette magazine that Hachette has said, I will pay the $0.07 per copy for. What Anderson says about that is, well, some of those were already in transit, so that doesn't evidence that they're continuing to ship. That's a red herring. They said, for March, we'll pay you the $0.07. There's not a dispute about that. And Mr. Stockard, the president of Anderson News, testified in his deposition that this is what he told Curtis, and I'm quoting, It's not $0.07 forever. It's $0.07 on February 1st, but it's until we can negotiate a better plan, and if your publisher doesn't like it after a week or a month or whatever, you know, they've actually got some time there that they can do something with their titles. That's exactly what they did. On January 15th, the president of Comag, who's alleged to be a non-conspirator, announced that nobody was going to pay, and it was in the press, in the papers, in the New York Post. No one will pay. We're not going to pay. And no one will pay the $0.07. And Mr. Anderson is writing his own death warrant. That's what the non-conspirator said. What Hachette did is they paid the $0.07 to get a 30-day extension. When Mr. Kellogg says that Comag signed an agreement, the agreement that Comag signed was a 30-day extension at no change in terms. There was no agreement for anything beyond that. It was simply a 30-day standstill, which time couldn't get despite begging for it at an improved price. Does that turn time into a conspirator where Comag isn't? Can I ask about these e-mails, a number of which seem to involve Mr. Jacobson and the conversation with Gillis? So I'll just tell you the evidence that I'm focused on. There's a conversation with Rustad and Kroger in which Jacobson is alleged to say there's going to be a two-wholesaler system, that he's going to teach Anderson a lesson and that no publishers are going to support the surcharge. Then there's a statement to May's source that a two-wholesaler system is his goal, that we now control the space. The conversation with Gillis you're familiar with. Then an internal time e-mail in which an executive vice president indicates a need to keep information on paper to a minimum. When you look at these documents and put them all together, why isn't this evidence that tends to exclude the possibility of parallel but non-conspiratorial behavior? The first answer is it doesn't actually matter for the reasons the district court said, which is there's no antitrust injury from an injury to someone who wasn't going to compete at the market price. So it doesn't actually matter at all. Now, I would dispute all of these things, but I said I'm not going to fight about them because there are explanations for every one of these things and there are explanations that I believe would satisfy you, but let's not go there. The other thing that I should say is that on this two-wholesaler system, which is really I think where I'll end, Mr. Anderson testified as follows when he was asked, have you thought about trying to get the price increase out of the retailers? His answer was, I think that there would be a zero chance of asking of the retailer absorbing the cost of the $0.07. Because if we were to put $0.07, that burden on a retailer, then what the retailer would do is analyze that and the space would be cut to nothing. He goes on to say they would have cut the publisher out of the business and us in the process. So the whole idea that a two-wholesaler system is a good thing is crazy. And Dr. Marks, their expert in her report at paragraph 374 says, the most immediate effect of reduced profitability of magazines to retailers will be for the retailers to reallocate shelf space to other alternative products. And you and I see that every day when we go into the supermarket. Thank you. Good morning, Your Honors. May it please the Court, George Gordon for Appley Current Circulation Company. I'm going to be presenting an argument related to the issues with respect to the application of the Matsushita Standard that are common to a number of the Appley's briefs. Counsel for Bauer and AMI and Rodale and Cable have allocated a brief period of time to talk about some issues specific to their clients, and Mr. Kiko for AMI is going to be talking about the argument with respect to lack of damages. Your Honors, this is a textbook case for the application of Matsushita. Under Matsushita, a plaintiff can't defeat summary judgment merely by presenting evidence that it claims supports its theory of collusion where the conduct of the issue is equally consistent with permissible competitive behavior. And here the conduct is not only equally consistent with permissible competitive behavior, frankly, it's much more consistent with permissible competitive behavior. And this analysis has to be made in context. And the context here is that Anderson announced a price increase to some publishers on January 12th and 13th and then to the industry in the phone call on January 14th. Told the industry very clearly, if you don't sign up, if you don't sign the form by January 23rd, and you don't agree by February 1st, we are not shipping you. And Anderson's competitors didn't announce the same increase. Anderson offered no good reason for publishers to accept this surcharge or the SBT demand. There's argument in the brief about, well, maybe there would be better product placement, and Dr. Marks references that. But there's no economic analysis, there's no content to that. There's no analysis of what the possible benefit would be of the shelf placement, weighed against the cost of having to accept the surcharge. And logically, as Judge Crotty recognized, that benefit doesn't make any sense. It would dissipate as soon as everybody took advantage of it because there would be no more preferential placement to have. So there was no good reason to accept this, as Judge Crotty recognized. And as a result, publishers didn't. They sought out competing wholesalers that were not offering the demand, which is exactly the kind of pro-competitive conduct that Matsushita was intended. What about the argument that it really wasn't a take-it-or-leave-it proposal, that there was room to negotiate, there also would be some efficiencies by changing the process of, you know, overprinting the number of issues? All I can say, Your Honor, is that we have to look at what Mr. Anderson said and what Mr. Anderson told the industry. And he said it was not negotiable. He didn't, he wouldn't, from the perspective of my client, Curtis, Mr. Crotty met with Mr. Anderson on January 21st. At that point in time, the record shows he explained to Mr. Anderson that Curtis's publisher clients had all said no. They had pulled them and they all had rejected it. Mr. Anderson said at that point in time, well, February 1st, and if they don't agree about February 1st, we're not shipping. Is that a factual question, whether he would have negotiated? Indeed, he said this is all or nothing, wouldn't be the first businessman to make that kind of initial offer. And then there does seem to be some evidence that there were negotiations. The question is on summary judgment. Do we, you know, just resolve that issue? The undisputed record from both Mr. Kastari's and Mr. Anderson's testimony is that Mr. Kastari tried to reach Mr. Anderson every business day from January 21st to January 28th to have a discussion, and Mr. Anderson never returned his phone calls. So at least with respect to Curtis, there was no opportunity to have any additional discussion. Did Mr. Anderson offer an explanation that he had been told that Curtis, Mr. Jacobson of TLUR and Mr. Kastari were in lockstep and they had already said they weren't going with it, or Kastari hasn't, and so why, or Jacobson had said maybe, why respond? What Mr. Anderson said was that he thought, he interpreted the statements made to him that Mr. Kastari had given Mr. Jacobson his proxy. That was his interpretation. The problem is he also, Mr. Anderson also admitted in his deposition, this is cited in our brief, that it was up to the publisher to decide whether or not to pay the surcharge, which is precisely why he went to meet with the publishers and not the national distributors initially. So there was no proxy for Curtis to give. If he had struck a deal with someone else, with Time, TWR, or other publishers, he still would have had to negotiate with Curtis's publisher clients, which he admitted in his deposition as well. So the whole proxy idea doesn't make sense on the face of the record. And Mr. Wilson mentioned, and I won't belabor, I think the best evidence that the conduct here was consistent with independent interest of the publishers is the fact that the non-defendant publishers, Comag's clients, that Anderson asserts were not part of the conspiracy, behaved the same way. The testimony from Mr. Feltz, a Comag executive, which is in the record and cited in our briefs, is that their publishers... Is that evidence sufficient in summary judgment context? I understand in an antitrust summary judgment context. I think the evidence is sufficient to show that the conduct was consistent with the independent interest of the alleged conspirators. First of all, there is no good reason to accept the price increase. Non-defendant conspirators... I'm sorry, non-defendant and non-conspirator publishers didn't accept the price increase. What happens if we think that there was evidence of an agreement but were persuaded that there was no good reason for them to say yes to the $0.07 surcharge? Where are we? Well, I think if there was evidence... In that case, I mean, no agreement was necessary. There would be no reason to have an agreement in that situation. But I also think for the reason... Wouldn't it be unlawful to have such an agreement? No, I'm saying that I'm saying there the evidence would be equally... would be equally consistent with both an independent and a conspiratorial outcome. I mean, I think... I think the court in the Sixth Circuit in the Highland case summed it up well, where the court, in affirming summary judgment, noted that the plaintiffs had put forth what it characterized as being a good deal of circumstantial evidence supporting their theory of collusion, but the problem was there wasn't evidence that disputed the conclusion that that conduct was also consistent with independent conduct. And that makes sense with respect to the proposed price increase, but what about... What are we to do with the record evidence about the two-wholesaler system, that, you know, we're going to change the field of play here and it's going to be reduced to a two-wholesaler system? Well, I think two things, Your Honour. One is that evidence and those statements are equally consistent with simply statements of fact, that if Anderson and Soar stick with this, this is what's going to happen, because the publishers have already said... You know, more than 1,400 publishers had said that they weren't going to pay according to Anderson's own documents. So that's just going to be a fact. And then there's the issue of plausibility, as Mr Wilson noted. Why in the world would publishers and national distributors want to do this? Mr Anderson himself, a testimony that Mr Wilson quoted, shows that that conspiracy would be entirely irrational. It would be a conspiracy to drive your publications off the shelf. That makes no sense. In addition, there's no reason to believe if the two wholesalers were left and did have increased market power as a result, that they wouldn't just turn that increased market power upstream as well. And none of the record evidence is inconsistent with the idea that if they could turn it downstream, they could turn it upstream as well, and one would expect a rational economic actor to get margin from wherever it could. And we cite, actually, in our papers, Dr Picard, who was the industry expert for the plaintiffs, when Source went out of business, he, on his blog, noted that now that it indeed is a two-wholesaler market, publishers are going to be at the mercy of these two wholesalers, and they will be able to make more significant demands with respect to the economics, with respect to price, and the like. So there's no... The whole two-wholesaler idea, it just doesn't make any economic sense. And there are two things... At the motion-dismiss stage, there are allegations that the court looked at in analyzing the plausibility of the conspiracy were principally, number one, that the news group and Hudson were part of the conspiracy, that it was the wholesalers who had helped implement this were part of the conspiracy, and this theory about being able to squeeze margins from the retailers. We've talked about now how the record's developed on the theory of squeezing margins on the retailers, and you didn't hear a balance counsel say anything about TNG or Hudson being part of this conspiracy. There's simply no evidence in the record. They've deduced no evidence of any such conspiracy involving TNG. And Hudson. So where... This court in publication paper, the Supreme Court in Matsushita, said, look, where the conspiracy doesn't make economic sense, where it's implausible, you need particularly strong evidence in order to show that there's evidence that tends to exclude the possibility of independent conduct. And that evidence just doesn't exist here. There's plenty of evidence of lots of communications with regard to the pricing increase, at least. There's plenty of evidence of communications. I wouldn't dispute that, Your Honor. And the question is whether that... Are we going to hold the line and, you know, are we solid in Bauerland and so on, right? The question is whether that tends to exclude independent conduct. And as Judge Crotty found, that evidence and those communications are consistent with something you'd expect parties to do, which is monitor what's going on in the industry. As Your Honor noted, this was a very compressed time period. This was playing out over two weeks. It was a potentially seismic change in the industry. Anderson had put down an ultimatum and threatened to cut off any publisher that wouldn't agree to the surcharge. People were scrambling to figure out what to do. You had communications involving companies like DSI, who are... That's its job, is a marketing and merchandising company for the publishers. Its job is to find the alternative plans. But you need to know what's going on. Is Anderson going to relent? What are the potential alternatives for getting to the marketplace? So the fact that there's some communications monitoring the marketplace is really of no surprise and is not inconsistent with independent conduct. And nor are the communications... The panel has asked about the communications between, for example, Mr Custardy, Mr Anderson, Mr Custardy and Mr Gillis. Those two communications as well are consistent with a recognized... For example, recognized interdependence in that the decision that time made would necessarily affect what options might be available for kernels. As Mr Custardy explained in his deposition, explaining his discussion with Mr Anderson, if time decided to pull from Anderson, then Anderson would likely not be viable anymore. And so staying with Anderson would not be an option. So what decision others made... I mean, there's a certain amount of interdependence in the industry. What decisions others made... It's really a factual argument. You know, that's a very reasonable spin on these communications, but... But that's exactly the... Well, that's exactly what Matsushita goes to, Your Honor. Where there are competing, reasonable, alternative explanations... Is the analysis different if there is direct evidence of an agreement? I think it would depend on the nature of the direct evidence. As a court-recognized and publication paper, direct evidence sometimes still may require an inference, so I think it would depend. There is no... Well, the arguable direct evidence here... I don't think it is. I would argue it's not direct evidence, Your Honor. It's not evidence that's tandem out to an admission of an agreement, like you had in publication paper where you had testimony at a criminal trial. So you don't have that character of evidence here. And if you look at the cases applying Matsushita, if you look at text messaging, where the court interpreted what the word collusion meant in the document as part of the Matsushita analysis, if you look at Evergreen, where the court was interpreting the statement, what was meant by one of the defendants when they said, we're going to pick a winner. Matsushita does require not making findings a fact, but identifying competing and alternative inferences and explanations... Inferences from conduct and explanations for conduct, and in situations where they are equally consistent between a competitive explanation and a conspiratorial explanation, there needs to be something more. There needs to be actions contrary to self-interest. There needs to be something more to say, why did they do this? And that's exactly what's missing here. Thank you. May it please the Court, my name is Daniel Ansiska. I represent Bauer. Very briefly, Your Honors, and thank you again for your patience this morning, Bauer is a great example of the unilateral independent reasons to react as it did. Bauer faced a very stark decision in mid-January. There is undisputed proof that it would have cost Bauer the price increase over $30 million alone. There is undisputed proof that over 90% of Bauer's revenues were retail. There is undisputed proof from Mr. Anderson's own words that he was threatening to leave the business if he did not receive this enormous price increase. With this context, as Your Honor pointed out in the Apple case, you must look at the context. What was Bauer to do? In fact, the only logical explanation was Bauer would look for much better business terms from another wholesaler. And who was it to look at? News Group was the most obvious because of its pro-logics joint venture with Anderson. And Anderson knew that. That was the whole purpose of the going dark strategy. Even if that's correct, would it have been appropriate for Bauer to enter into an agreement with AMI? Bauer and AMI had conversations directly, it seems. They didn't agree on boycotting Anderson or doing anything to Anderson. All that occurred is that Bauer spoke with DSI, which already he'd had a contract with, was his marketing distributor. AMI is the parent of DSI. Like Bauer, AMI... And it was obvious. Anderson's own internal documents commented that Bauer and AMI would never agree to this. All Bauer did was say the rosiest scenario was that Anderson would drop, rescind the surcharge. If not, we needed to explore the alternative wholesaler, the News Group. And AMI, as the parent of DSI, told them, like with Bauer, it wasn't going to accept the surcharge, and all the discussion was about was about an alternative wholesaler, the News Group, if Anderson did not relent. And you look at that e-mail that they referenced. The collective resources? Correct. What about the collective resources part of it? Well, the collective resources is the News Group, but if you look at Mr. Roscoe's comment, he says if Anderson goes down or decides to leave the business. Why shouldn't we have believed Mr. Anderson when he told everyone in the entire industry, I'm going to leave the business, I've lost $100 million, you've got two weeks to react? Why should we not believe him? Thank you, Your Honors. Your Honor, I'm John Hadlock. I'm here representing Rodale, and I'd like to speak very briefly because Rodale feels very strongly that it's been just named as a tag-along defendant with no appreciable evidence against it whatsoever. After all these years of discovery and litigation, it's turned out that the plaintiff's claim against Rodale is based on two ambiguous e-mails, one dated January 29th of 2009, wherein Mr. Hallecker of Robit Mail is alleged to have did, characterizing an e-mail that Mr. Sullivan of Comag was, quote, dangerous, and the next day in an e-mail also to Rodale's marketing consultant, an e-mail that said, is Bauerland solid? They have attributed those two ambiguous e-mails as an agreement among Rodale and the other defendants to engage in the conspiracy that is the subject of this lawsuit. The complaint has nothing against Rodale other than the Sullivan is dangerous e-mail, and there is nothing in the principle appellate brief against the Rodale at all in the argument section other than the mention of those two e-mails in the facts section, and I, in our brief, said that's enough to sustain the opinion against Rodale, so they came back with 16 lines in their reply brief saying that, just citing those two e-mails and saying they're enough to, quote, support a strong inference of conspiracy which would permit a jury to conclude that Rodale joined the boycott. There's two problems with that. A, those e-mails are far too ambiguous to draw that conclusion, and second, to say that all they did is join the conspiracy on the 29th of January after Curtis and the other distributors had already told Anderson that they were being terminated is not illegal. It's just me too, tag along. And the court, especially in text messaging, said there's nothing wrong with doing that. So, secondly, very briefly, they have alleged in the complaint and then in their reply brief that if their argument on those facts is good enough, then Rodale should be held responsible on an agency theory if they find Curtis to be responsible. They, of course, assert that Curtis is not responsible for any illegal activity, but on the ADSL case, the court was very clear when you have an agent representing hundreds of principles, then you can't just attribute the agent's activity to every principle. You have to go and show that each principle agreed to the illegal act, and, of course, there may be no effort to do that. So on those two grounds, Rodale feels it should not have ever been in this case. May it please the Court, my name is Jay Katz. I represent Cable Distribution Services, Inc. The arguments made by Mr. Gordon on behalf of Curtis Circulation applies as well to Cable, also a national distributor. Rather than repeat those arguments, I would just reiterate that Anderson has failed to proffer any evidence upon which a reasonable, rational jury could infer that it was more likely than not that Cable engaged in a conspiracy rather than having acted independently in its own self-interest. Cable had every reason not to ship Anderson. On January 29th, Cable was informed by the president of Anderson that Anderson would not rescind the surcharge, that it would not distribute magazines for Cable's publishing clients, and that more importantly, or at least as importantly, that it would not pay Cable $10 million, later $7 million net of credits, when it was due on February 2nd. Of course, Anderson's evidence does not tend to exclude the possibility that Cable acted unilaterally, Cable under the Matsushita rules were entitled to summary judgment. With the court's permission, if there are no questions, I would cede the balance of my time to Mr. Kiko. Thank you. Good morning, Your Honors. David Kiko for American Media and Distribution Services. I'd like to address two issues and then briefly mention three others in my very brief period of time. I'd like to focus on the facts as they relate to AMI to, as Judge Livingston said in Apple, to put them in the context of the entire record. Secondly, I'd like to briefly talk about the fact that Anderson News suffered no damages, and then I'd like to also briefly mention the fact that, of course, plaintiffs ask that the decision to strike certain portions of the Crawford testimony of Professor Marks be upheld, because, in fact, she did no economic analysis whatsoever to support that analysis, and, indeed, it's contrary to logic. Secondly, that although the defendants did not, sorry, the plaintiffs did not respond to, I'm sorry, it is the defendants, but the defendants were also the counterclaimants, did not respond to the comment about if the case is sent back, it shouldn't go back to Judge Crotty. That's because, obviously, we didn't think that was appropriate and didn't think it was necessary to respond. And then, finally, the fact is that Anderson Services has no antitrust standing. That is very clearly set forth in the GKA Beverages case, which is directly on point. So if I can just turn to the other two issues I'd like to discuss. Putting things in context. So throughout the Anderson papers, it talks about the fact that everyone moved in lockstep, that on February 1, every single one of the defendants cut off Anderson News. That, in fact, is not the case. As you've already heard, Hachette actually shipped all of their monthly magazines that were to go on the shelves through February 27. American media did exactly the same thing. The threat about was this a real threat or not, it's clear that the publishers believed, certainly American media believed, that Anderson would not deliver the magazines but for the fact they agreed to the seven cents and the surcharge, the buyback of the inventory. Because although American media had actually just signed a contract with Anderson News in November of 2008, which set the prices for the entire year, thus Anderson had no right and no ability to be able to impose a surcharge on it, it called up before shipping those magazines and said if we ship those magazines and we agree to pay the surcharge with respect to those magazines, will you deliver them? And it was told yes. And it shipped them. Those magazines were delivered all the way through February 6, the day before it was announced that Anderson had gone dark on February 7. And indeed American media at the first meeting on February 12 where Anderson announced the surcharge specifically said we cannot afford to pay. Anderson expected that. It was the only publisher that he had prepared some analysis saying this is how we can help you pay. And it in fact was going to cost American media in the first year alone $33.5 million if it was going to go along with what Anderson had said. And American media was in the process of restructuring its debt which at that point was $1.1 billion. It was in great financial condition. And Anderson knew that it really couldn't afford to pay and that wasn't a surprise at all. But what American media did is they said we propose an alternative. We'd like to negotiate with you. DSI has been actually working on a plan, a joint plan for Bauer and American media to reduce the publisher, the wholesaler's cost and said we'd like to discuss that with you. Anderson said at the end of the meeting it's seven cents and the buyback or nothing. American media persisted in calling throughout this period saying we'd like to discuss alternatives. Anderson refused and that's undisputed. So American media tried to negotiate. It was turned down. It actually shipped. It's hard to see how it could have been included but it said it could be included in this boycott given that. What's really happened is there's a conflation of two different things. Bauer and American media and other publishers decided independently to not, they couldn't pay the boycott. There then were discussions about what do we do as the alternative? And those e-mails that we're talking about fell into three. These are the ones the 13th, January 13th and January 14th. Right. And if you actually parse them as Your Honor did, what it talks about is if, in fact, Anderson won't ship our magazines and Anderson goes out of business, then we are going to, we need an alternative. So what they're about is gathering information about what are others doing. As you've already heard, things are interdependent to some degree. It is then going to, after the plan is formed, it is then jointly going to retailers and they're the other important industry force that were mentioned in there to talk to them. Take, will you take our magazines from someone else, namely the news group. And, in fact, Interboro teaches us as well as the Seagrams versus Hawaiian Oki, or Oki, I'm not sure how to pronounce it, that, in fact, it is okay to, once you've agreed to, once you've independently decided that you want an alternative to then try to convince the others to take your alternative. If I may, very briefly on the damages issue. Thank you. First of all, you heard Mr. Kellogg say that they had turned the corner. In the first quarter, Anderson News made money. That is incorrect. If you look at the record, it's A2276. Anderson News lost $2.95 million in the first quarter of 2009. Its first quarter ended at the end of January. January, admittedly, was unaffected by the alleged boycott because everyone shipped their magazines in January and they were all delivered. And, indeed, if you look at the first quarter, the January alone, Anderson News lost $2.1 million in that time frame alone. Anderson News's net worth was negative $79 million. Its own expert admits that Anderson News, as it stood the end of January, was worth nothing. How could that be? It's because the expert says if you took everything as it is, the expected cash flow, and you present-valued it, the value would be $41 million. But Anderson News liquidated its assets for $47 million after expenses, which meant it was worth $6 million more dead than alive, so there couldn't be any damages. So how does it get its damages? It does a couple of things. It actually, the $41 million is highly inflated. It's inflated for two reasons. It's inflated because they said, well, prices were going to increase of magazines by 6%. If you look historically, it's at 1%. If you actually take 1.85%, which is what it was, which is clearly predictable based on where the prices had been, Anderson News is worth a negative $100 million. If you add to that the fact that the sell-through rate had been slowly declining, which their expert held steady, the negative value is almost $160 million. They then do a couple of other things. They take all of these programs, which didn't exist anywhere, and say even though the company had lost money on an operating basis for 13 years in a row, not just a little period of time, for 13 years in a row, we're suddenly going to turn it down. There are all these programs that management never had really thought of, although there's a couple of mentions in some of these, and that will suddenly make this business profitable. I submit to you that the case law does not allow you to do that. They also take trade debt. So Anderson was slow pay, as you've already heard. And they say, well, that's really an asset. The fact that we owed all this money to the trade, that's not supported in any of the case law. And finally, they say this 2% increase, that we would have gotten 2%. There are a couple of problems with that. One, if you actually use the right numbers for the present value in the current company as it is, and even put in this 2%, the company still has no value. The second issue is, of course, there's no real evidence that they would have gotten the 2%. The offer from the news group, which they say they had, only covered certain Time magazines and didn't cover any of the other news group, sorry, the Time Warner publications magazines. And then, secondly, of course, there was no, the Comag deal, there's no evidence that it was ever accepted by anyone, this 2%, because it came with all kinds of other strings. Thank you for indulging me. I really appreciate it. I'd like to begin by addressing a couple of cleanup issues from my opening argument. Judge Carney, you asked when the Gillis testimony, the conversation took place in the second week of January. So in the very early stages of the formation of the conspiracy, all, at least four of the publishers were already on board for driving Anderson out of business and making it a two-hole sales system. And, of course, we saw the Bauer email about using our collective resources to move away from Anderson. Second, you had asked about whether the surcharge was negotiable. Mr. Anderson sent a letter on January 26th to all the publishers stating that the seven cents was negotiable. That's at A, 1958 of the record. Now, what this case really comes down to, the gist of it is, is the evidence equally consistent with completely unilateral action? Now, it's hard for them to say that with a straight face. In the face of emails and testimony that says we have to simultaneously move our collective resources away, defections will blow up the entire plan. Everyone needs to stick to their guns. That evidence is much stronger than there was in a number of the cases in which the court has found, such as Apex Oil, and indeed publication papers in which the court has found sufficient evidence to go to a jury. Now, the district court dismissed the direct evidence, the emails, and the deposition testimony on the grounds that defendants in their depositions denied that they conspired. But the jury was surely in free to conclude that the denials were belied in the evidence. Let me give you one example. Mr. Allager's panicked email about Comag will ship, Comag is dangerous. He was asked at his deposition about that. And he said, well, I was merely commenting on the fact that Comag issued inconsistent press releases. Now, maybe a jury will buy that, or maybe they'll think it's preposterous and then he's hiding the fact and trying to explain away a deeply incriminating email. And with all respect, the district judge doesn't get to decide that. The jury does. There were other evidence, as Judge Livingston pointed out, concealment. They said, let's not put stuff on paper. Let's not call the retailers together because there's going to be litigation about that. We've got to call them separately. The phone chart, a dramatic increase in phone calls in January between direct competitors, between direct competitors, and they have offered no explanation for that. Indeed, the explanations they've offered are preposterous. For example, there was a call one business day before they cut off Anderson between Mr. Duloc of Cable and Mr. Jacobson of Time Warner. This was at 619 in the morning, and they were asked at their deposition what they talked about. Mr. Duloc said it was Super Bowl tickets. We were talking about Super Bowl tickets. Mr. Jacobson said we were talking about backroom billing. Now, a jury could conclude that they were trying to disguise what it is they were talking about. Similarly, another call between Jacobson and Castardi. Jacobson said we were talking about personal issues, just personal stuff, and Mr. Castardi said we were talking about billing and collection issues. Now, it would have been one thing if all the defendants had said, as counsel said for them, well, this was just industry chatter occasioned by Anderson's proposal, and that's what the district court dismissed it as. But in fact, virtually all of them disclaimed having any conversations about Anderson's proposal. Instead, attributed their conversations to a litany of other reasons and more of time, said no, no, it would be inappropriate to discuss Anderson's proposal with our competitor. Castardi said no, no, no, I would never talk with my competitors. And yet there was a tenfold increase in conversations during that period, just the sort of evidence that in Apple the court found probative to make it more likely than not of a conspiracy, and indeed worse here because of the, frankly, the blatant lies that they made in their depositions about what they were talking about. Again, the economic evidence of Dr. Marks suggests that a conspiracy was more likely than not. I've gone through that, so I'm not going to repeat that. But district court the first time around, as this pointed out, did five things that were wrong in his initial opinion. He did all five of them again at the summary judgment stage. He said, one, you can't have a conspiracy because everybody else initially responded differently to the surcharge. Well, as the court pointed out, varied reactions to the surcharge doesn't mean that there wasn't a conspiracy because they could have been hedging their bets or they could have been, you know, initially feigning efforts all the while that they were conspiring. Second, he said the common stimulus of Anderson's proposal means that the conspiracy is not actionable because they just had to react to this. Well, again, yes, they did have to react to Anderson's proposal, but they don't get to conspire, and the evidence is absolutely clear that they did conspire. Third. He said the stimulus would make it, they had to monitor, so the stimulus drains frequent communications of some efficacy that they might have in another context. And I realize you're pointing to more than just the fact of communications but to the specific content of communications. But the stimulus is not irrelevant to the context. You know, if all they were doing was what was done in Interborough of, you know, deciding what your wholesaler options are after you reject a particular wholesaler. Recall that Interborough was decided after a trial on the merits and the court found no direct evidence and no conspiracy and, in fact, direct evidence that they were all acting unilaterally because they cut off the other wholesaler at widely different times. Some of them were still negotiating with the wholesaler. The evidence is very different here, and we're in the summary judgment phase where all evidence, all permissible evidence, inferences under Massachusetts have to be drawn in our favor. So the fourth thing that the district court did, again, is say the boycott was justified because Anderson was asking for a price increase. He was asking for a super competitive price. Again, the court rightly rejected that as a false analytical construct, and yet Mr. Wilson's making exactly that argument here. Well, they were asking too much, so, of course, we rejected it and we can get together and do that collectively because that's in the interest of lower prices. I mean, that's simply not the way the antitrust laws work. And, finally, the court concluded that Anderson's evidence was not incriminating because he found the innocent explanations more plausible. Well, I'm sorry, but he doesn't get to decide that. The jury gets to decide that. We have presented enough evidence to get this case to a jury. Mr. Anderson and Anderson News have waited years to try to try their case to the jury. All the arguments you heard from defense counsel, they can make those to the jury. Maybe the jury will be convinced, maybe they won't. But we have a right to get to a jury, and I would ask the court to assign the case to a different judge on remand because Judge Crotty, with due respect, has made it absolutely clear that he is not going to depart from the quote-unquote faulty constructs that this court noted, and he also went so far as to call Anderson's claims ridiculous and absurd in his opinions. And Anderson is entitled to have a jury trial with a judge who is going to approach the evidence with an open mind. Thank you very much. Thank you all. Very well argued.